**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

In re Application of THE ISLAMIC
REPUBLIC OF PAKISTAN for an Order
Permitting Discovery Pursuant to 28 U.S.C.
§ 1782

THE ISLAMIC REPUBLIC OF PAKISTAN,

       *Petitioner*,

       v.

ARNOLD & PORTER KAYE SCHOLER
LLP,

       *Respondent*.

Misc. Action No. 18-103

Electronically Filed

Hon. Rosemary M. Collyer

**OPPOSITION TO APPLICATION FOR AN ORDER
PERMITTING DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

    A.    Factual Summary Of The Underlying Dispute Between Pakistan And Karkey. .......................................................................................... 5

    B.    Relevant Procedural History ............................................................... 9

        1.    Karkey Initiates Arbitral Proceedings Before ICSID. .............. 9

        2.    Pakistan Seeks Production Of Backup Tapes. ......................... 10

        3.    The Tribunal Rules In Karkey's Favor, And Pakistan Seeks Annulment. ........................................................................... 17

        4.    Pakistan Seeks Production Of The Backup Tapes From Arnold & Porter Under Section 1782. ................................... 18

ARGUMENT ..................................................................................................... 18

I.    Arnold & Porter Does Not Have Possession, Custody, Or Control Of The Backup Tapes. ..................................................................................... 18

II.    This Court Lacks Statutory Authority To Grant Pakistan's Application. ......................... 20

    A.    Section 1782 Does Not Extend To The Annulment Proceeding. ......................... 20

    B.    The NAB Investigation Is Not A Legitimate Foreign Proceeding. ...................... 24

III.    This Court Should Decline To Exercise Its Discretion To Order Discovery Under Section 1782. ................................................................................. 25

    A.    Karkey, Arnold & Porter's Client, Is A Participant In The Foreign Proceedings. ................................................................................... 26

    B.    The Character And Nature Of The Foreign Proceedings Weigh Against Section 1782 Assistance. ................................................................... 27

        1.    The ICSID Annulment Proceeding ........................................ 27

        2.    The NAB Investigation .......................................................... 30

    C.    Pakistan's Apparent Purpose For Making Its Section 1782 Application Is To Circumvent The Arbitral Tribunal's Reasoned Decisions Denying Pakistan's Requests For Restoration Of The Backup Tapes. ............................... 32

    D.    The Discovery Sought Would Be Unduly Intrusive And Burdensome. ............... 32

CONCLUSION.................................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Doe v. District of Columbia*,
231 F.R.D. 27 (D.D.C. 2005) ........................................................................................18, 19

*In re Application of Caratube Int'l Oil Co.*,
730 F. Supp. 2d 101 (D.D.C. 2010) ....................................................................................30

*In re Barnwell Enterprises Ltd.*,
265 F. Supp. 3d 1 (D.D.C. 2017) ........................................................................................18

*In re Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*,
685 F.3d 987 (11th Cir. 2012). ..........................................................................................21

*In re Grupo Unidos Por El Canal, S.A.*,
No. 14-mc-00226-MSK-KMT, 2015 WL 1810135 (D. Colo. Apr. 17, 2015) ......................22

*In re Microsoft Corp.*,
428 F. Supp. 2d 188 (S.D.N.Y. 2006) .............................................................................26, 27

*In re Operadora DB Mexico, S.A. de C.V.*,
No. 6:09-cv-383-Orl-22GJK, 2009 WL 2423138 (M.D. Fla. Aug. 4, 2009) .........................22

*Intel Corp. v. Advanced Micro Devices*,
542 U.S. 241 (2004) ................................................................................................. *passim*

*Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*,
ICSID Case No. ARB/13/1, Award, August 22, 2017 .................................................... *passim*

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015) ....................................................................................19, 23, 33

*Nat'l Broadcasting Co. v. Bear Stearns & Co.*,
165 F.3d 184 (2d Cir. 1999) ..........................................................................................20, 21

*Republic of Kazakhstan v. Biedermann Int'l*,
168 F.3d 880 (5th Cir. 1999) ..........................................................................................21, 30

*Tavoulareas v. Piro*,
93 F.R.D. 11 (D.D.C. 1981) ................................................................................................19

*United States v. Sealed 1, Letter of Request for Legal Assistance from the Deputy
Prosecutor General of the Russian Federation*,
235 F.3d 1200 (9th Cir. 2000) ....................................................................................24, 31, 32

## Statutes and Rules

28 U.S.C.
    § 1782 ................................................................................................................ *passim*

Fed. R. Civ. P.
    26(b)(1) ...................................................................................................................33
    26(b)(2)(C) .............................................................................................................33
    26(b)(2)(C)(i) .........................................................................................................34
    34(a)(1) ...................................................................................................................19

## Other Authorities

*About ICSID*, ICSID, https://icsid.worldbank.org/en/Pages/about/default.aspx ...........................9

Agreement between the Islamic Republic of Pakistan and the Republic of Turkey
    Concerning the Reciprocal Promotion and Protection of Investments .........................9, 30, 31

Christoph H. Schreuer *et al.*, *The ICSID Convention: A Commentary* (2d. ed.,
    2009) .....................................................................................................................11, 31

Convention on the Settlement of Investment Disputes between States and
    Nationals of Other States ("ICSID Convention") ..................................................10, 11, 17, 28

Eric De Brabandere, *Investment Treaty Arbitration as Public International Law*
    (2014) ...........................................................................................................................23

*Hans Smit, International Litigation Under The United States Code*,
    65 Colum. L. Rev. 1015 (1965) ...........................................................................................22

ICSID Arbitration Rules .................................................................................................11, 27

International Bar Association Rules on the Taking of Evidence in International
    Arbitration (2010) .............................................................................................................10

Jean-Christophe Honlet, Barton Legum and Anna Crevon, *Investment Arbitration:
    Challenges to the System*, *ICSID Annulment, in International Investment Law:
    A Handbook* (Marc Bungenberg *et al.* eds., 2015) ...............................................................11

Updated Background Paper on Annulment for the Administrative Council of
    ICSID (May 5, 2016) .......................................................................................................29

## INTRODUCTION

The application for discovery under 28 U.S.C. § 1782 now before this Court is the latest chapter in a years-long pursuit of false allegations of corruption leveled by the Petitioner, the Islamic Republic of Pakistan ("Pakistan"), against the Turkish energy company, Karkey Karadeniz Elektrik Uretim A.S. ("Karkey").  Karkey is the client of Respondent in this proceeding, Arnold & Porter Kaye Scholer LLP ("Arnold & Porter").  Karkey builds and operates "Powerships"—vessels with power generation equipment mounted on them that can be sailed around the world and connected to the electricity grids of countries in need of power.  In 2008, Karkey—along with numerous other rental power providers—contracted with a state-owned power company in Pakistan to supply electricity to Pakistan's failing power grid.  In 2009, a politically motivated individual member of Pakistan's parliament undertook a campaign to undermine Pakistan's rental power projects.  To this end, he resorted to the activist Supreme Court of Pakistan to assist him in his effort.  Notwithstanding the absence of any evidence of corruption, the Supreme Court took up the case, and in 2012 issued an opinion declaring void *ab initio* all of Pakistan's rental power project contracts—collectively—and ordering Pakistan's anti-corruption agency, the National Accountability Bureau ("NAB"), to investigate for possible corruption.  The ensuing investigation by NAB lasted six years, during which no evidence whatsoever was found of corruption by Karkey.  The reason for that is simple: there *was* no corruption by Karkey.

After four years of international arbitral proceedings, an arbitral tribunal composed of three preeminent international law practitioners (the "Arbitral Tribunal") unanimously denied Pakistan's trumped-up corruption charges as lacking any basis, and held Pakistan liable—for an amount of more than US$500 million, plus interest that is accruing daily—for unlawfully expropriating Karkey's investment in Pakistan, among other breaches of its international law

obligations.  *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case

No. ARB/13/1, Award, August 22, 2017 (hereinafter "Award (Appl., Ex. A)").  The arbitral

proceedings, which were governed by the Convention on the Settlement of Investment Disputes

between States and Nationals of Other States, Mar. 18, 1965, 17 U.S.T. 1270 (the "ICSID

Convention"), were exhaustive, with thousands of documents produced in discovery, thousands

of pages submitted in numerous rounds of briefing, and numerous fact and expert witnesses

examined, and oral arguments presented, over a two-week merits hearing (the "Arbitration").

Lacking any credible defense on the merits to Karkey's claims for expropriation and

other international law violations, Pakistan pursued a strategy in the Arbitration of leveling

unsubstantiated accusations of corruption against Karkey.  In service of those accusations,

Pakistan pursued vexatious and abusive requests for fishing expedition-style discovery that it

hoped might dredge up something—anything—to substantiate its allegations.  For example,

Pakistan filed no fewer than four separate requests—over the course of a single year—for the

Arbitral Tribunal to order Karkey to restore and search 70 archaic backup tapes storing archived

copies of Karkey's electronic records for a time period prior to 2010 (after which Karkey had

modernized its backup system).  Having found no evidence of corruption in all of its years of

investigation within Pakistan or in the voluminous documents already produced in the

Arbitration, Pakistan persisted in demanding that it be permitted to search for something that did

not exist.  The Arbitral Tribunal rejected these requests, holding that restoration of the outdated

backup tapes would be unduly burdensome, expensive, and time-consuming, that no compelling

showing for their production had been made, and that Karkey already had complied fully with its

discovery obligations by producing all accessible and responsive documents (including emails)

from the same time period backed up by the tapes.

In denying Pakistan's requests, the tribunal emphasized the lack of any basis for Pakistan's allegations of corruption.  It explicitly noted in its August 22, 2017 Award that Pakistan's request "was based on allegations of suspicion of corruption and declarations of informants of highly suspect credibility, after the Pakistani authorities, with powers considerably greater than those of the Tribunal, had failed to establish the existence of such corruption after several years of investigation."  Award (Appl., Ex. A) ¶ 537.  Tellingly, Pakistan's own investigative anti-corruption authority (NAB) had "concluded that there was *no evidence of any wrongdoing by Karkey* under [Pakistan's anti-corruption law, the National Accountability Ordinance], 'after a detailed examination of all accounts and documents.'"  *Id.* ¶ 539 (emphasis added).

In its Award, the Arbitral Tribunal unanimously found on the merits, *inter alia*: (i) that the Pakistan Supreme Court's decision purporting to void Karkey's contract was arbitrary and constituted an unlawful expropriation of Karkey's contractual rights; and (ii) that Pakistan's arbitrary and unlawful detention of Karkey's power-generating vessels also constituted a breach of Pakistan's international law obligations.  In addition to awarding Karkey damages (plus interest) for the injuries it suffered as a result of Pakistan's breaches of international law, the Arbitral Tribunal ordered Pakistan to reimburse a significant portion (more than US$10 million) of Karkey's costs and attorneys' fees incurred in the Arbitration.  *See* Award (Appl. Ex. A), ¶¶ 1081(xv)–(xvi).  In reaching its decision to award these costs and fees, the Arbitral Tribunal notably took into account Pakistan's conduct during the proceedings, and found, *inter alia*, that "*Pakistan seemed to be trying to delay and disrupt the[] proceedings*."  *Id.* ¶ 1073 (emphasis added).

It now has been well over a year since issuance of the Award, and Pakistan's delay and disruption tactics persist.  Pakistan has not paid Karkey a dime, and has initiated an annulment

proceeding pursuant to the ICSID Convention (the "Annulment Proceeding").  Through its

Application for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782 ("Application"),

Pakistan is now resorting to this Court in furtherance of its obstructionist and dilatory strategy.

In essence, Pakistan is asking this Court to overrule the numerous and well-reasoned decisions

pursuant to which the Arbitral Tribunal declined to grant Pakistan the multiple expensive and

time-consuming fishing expeditions that it repeatedly mounted in the now-concluded Arbitration.

Specifically, in reliance on 28 U.S.C. § 1782, Pakistan's Application seeks an order requiring

Karkey's lawyers, Arnold & Porter, to produce documents from Karkey's outdated backup tapes

(as well as potentially even more expansive discovery).  Pakistan's Application is based on the

pretext that such "evidence" would be useful in the pending annulment proceeding at ICSID, as

well as in criminal investigations that were initiated in Pakistan prior to the Arbitration and that

purportedly are still active today (a full *six* years later).

*The first and most simple reason for which the Court should deny Pakistan's Application*

*is that Arnold & Porter does not have custody or control of Karkey's backup tapes.*  Declaration

of Anton Ware ("Ware Decl."), ¶ 4.  This simple fact should dispose of the Application in its

entirety (even though Pakistan after stating in one breath that its request is limited exclusively to

the backup tapes, states in the very next breath that the request is *not* so limited).[1]  Pakistan

should not be permitted to disavow its own stated limitation on the scope of its Application.  If

the Court were nevertheless to construe the Application more broadly (to include requests for

non-backup tape document discovery, and permission to propound interrogatories and take

---

[1] At footnote 3 of Pakistan's Application, Pakistan states the following:  "To be clear, Pakistan's Application is limited to the emails and other electronic documents maintained on the Backup Tapes related to the RPP Program, which is the focus of NAB's investigation. . . .  That being said, Pakistan cannot limit itself to the Backup Tapes."

depositions of Arnold & Porter lawyers), the Application still should be denied for several reasons.

As an initial matter, the Court lacks statutory authorization to order the requested discovery, because the information sought is not "for use" in the type of foreign proceeding to which Congress intended U.S. courts to provide assistance under section 1782.  Moreover, even if Congress had conferred on the courts the authority to order the discovery Pakistan seeks (which it did not), this Court should exercise its broad discretion under section 1782 to deny Pakistan's Application.  Having been requested and denied (four times) in the now-concluded Arbitration, the discovery sought is not pertinent to the Annulment Proceeding, which involves a narrow scope of review that excludes claims of factual or legal error.  As to the purported criminal investigation by NAB, it is a sham inquiry initiated by a legally invalid and politically motivated decision of Pakistan's Supreme Court, to which the U.S. federal courts should not lend their authority.  Finally, the requests in Pakistan's Application are as intrusive and burdensome now as they were when Pakistan sought the same discovery from Karkey in the Arbitration, if not more so.

For all of the foregoing reasons, discussed in further detail below, Pakistan's Application should be denied.

## BACKGROUND

### A.    Factual Summary Of The Underlying Dispute Between Pakistan And Karkey.

Since 2013, Arnold & Porter has represented Karkey in the Arbitration administered by the International Centre for Settlement of Investment Disputes ("ICSID").  *See generally* Award (Appl., Ex. A).  The dispute arose out of a 2008 contract (amended in 2009) between Karkey and Pakistan's state-owned power company, Lakhra Power Generation Company, Ltd. ("Lakhra").  This contract was one of a number of "rental power project" contracts that Pakistan signed with

various rental power project sponsors in an attempt to address one of the worst energy crises in Pakistan's history.  In accordance with its contract, Karkey supplied to Pakistan two "Powerships" and two support vessels (collectively, the "Vessels").  *Id.* at vi.  However, Lakhra failed to comply with its contractual obligations, and on March 30, 2012, Karkey served Lakhra a notice of termination of the contract, with immediate effect, and requested payment of certain amounts to which Karkey was entitled pursuant to the contract, including termination charges, mobilization and transport charges, and all receivables.  *Id.* ¶ 125.

In the meantime, beginning in July 2009, an entity that claimed to be the "Pakistan chapter" of Transparency International began asking government officials in Pakistan to review rental power project contracts for possible violations of public procurement rules.  *Id.* ¶ 104. However, Transparency International—the well-respected non-governmental organization based in Berlin, as distinct from the organization claiming to be Transparency International's Pakistan chapter ("TI-Pakistan") thereafter clarified in writing that "the positions espoused by TI-P [TI-Pakistan] with respect to rental power projects in Pakistan cannot be attributed to Transparency International."  *See* Declaration of Maria Chedid ("Chedid Decl."), Ex. A (Excerpts from Karkey's Counter-Memorial on Annulment), ¶ 23.

In September 2009, at the urging of an individual member of the Pakistani parliament, the Chief Justice of the Supreme Court of Pakistan opened a case (within the original jurisdiction of the Supreme Court) to pursue the parliamentarian's unsupported allegations of corruption in the award of the rental power project contracts.  Award (Appl., Ex. A) ¶ 105.  The Pakistan Supreme Court issued a judgment more than two years later, on March 30, 2012, concluding that *all* rental power project contracts (including Karkey's) had been procured in breach of public procurement rules, and were therefore void *ab initio*.  *Id.* ¶ 126.  The Award noted that, in reaching its blanket conclusions and applying them to the various companies that had entered into rental power

6

project contracts with Pakistan, "*the [Pakistani] Supreme Court made no explicit finding of corruption anywhere in the Judgment, nor any specific finding of corruption against, or involving, Karkey.*"  *Id.* (emphasis added).  Instead, the Supreme Court baldly asserted—without any evidence whatsoever—that all of the rental power project sponsors, together with various government functionaries, had been "'*prima facie*, involved in corruption and corrupt practices.'"  *See id.* ¶ 207.  The Supreme Court did not explain what it means to be "*prima facie* involved in corruption."  *See id.* ¶ 542.  Notably, the Government of Pakistan itself filed a petition before the Supreme Court seeking to reverse that decision, arguing, *inter alia*, that the ruling as to "prima facie" involvement in corruption was irrational and arbitrary.  *Id.* ¶¶ 133, 542, 556.

The Supreme Court also ordered Pakistan's anti-corruption agency, NAB, to conduct an investigation into possible corruption by rental power project sponsors and various public officials.  Award (Appl., Ex. A) ¶ 126.  NAB accordingly launched an investigation of Karkey (and of the other rental power project sponsors) in April 2012.  *Id.* ¶¶ 127–28.  NAB also prohibited Karkey from moving its Vessels from their moored positions without clearance from NAB.  *Id.* ¶¶ 128–130.  In an effort to secure the release of its Vessels, Karkey cooperated with NAB's investigation, which concluded that Karkey had engaged in no wrongdoing.  Accordingly, in September 2012, NAB, Lakhra, and Karkey entered into a "Deed" declaring that "KARKEY has no liability, and there remains no basis or evidence for proceeding(s) by NAB or any of the other Parties or GoP [Government of Pakistan] entities against KARKEY and/or its project/investment and that NAB has completed and closed its enquiry in respect of KARKEY."  *Id.*  In October 2012, NAB took the further step of issuing a "No Objection Certificate" confirming that it was satisfied that Karkey had no liability under Pakistan's anti-corruption law, and that NAB had "completed and closed its inquiry [in respect of Karkey]."  *Id.* ¶ 138.  The

Deed was signed by the Director General of NAB, and also provided for payment by Karkey of

US$17.2 million to settle all accounts and to resolve all matters arising from the contract, the

Supreme Court's judgment regarding rental power projects, and the NAB inquiry.  *Id.* ¶ 136.

In November 2012, at the urging of the same parliamentarian who had initiated the

campaign attacking the Government's rental power projects, the Supreme Court unilaterally

abrogated the Deed and the No Objection Certificate, and directed NAB to recover from Karkey

US$120 million (an apparently arbitrarily determined figure) before Karkey's Vessels would be

released and permitted to leave Pakistani waters.  *Id.* ¶¶ 140–42.  Pursuant to the Supreme

Court's directive (and in direct contradiction to the Deed and the No Objection Certificate), NAB

notified Karkey (i) that it would need to make the payment required by the Supreme Court

(which it inexplicably raised to US$128 million), and (ii) that Karkey's Vessels had "been

detained as security for [such] payment."  *Id.* ¶ 144.[2]

Shortly thereafter, in January 2013, the Supreme Court directed NAB to pursue criminal

liability against individuals involved in the rental power projects, and even to arrest them.  *Id.*

¶ 145.  In response, NAB's Chairman wrote to the President of Pakistan, expressing concern

about the Supreme Court's directives and intimidation tactics.  He stated that by "'becoming

involved in guiding investigations,'" the Supreme Court was encroaching on NAB's

independence, and "'placing extreme pressure on NAB personnel who appear before'" the

Supreme Court.  *Id.* ¶ 147.  NAB's Chairman further warned that the Supreme Court's pressure

created a "'danger of unfair investigation being resorted to.'"  *Id.*  The Supreme Court retaliated

by issuing a contempt order accusing the NAB chairman of "'causing interference with and

---

[2] Ultimately, one of Karkey's Vessels was detained for more than two years, while Karkey's three other Vessels remain in Pakistan's possession to this day.  Award (Appl., Ex. A), ¶ 131.

obstruction in the process of the Court and . . . the administration of justice.'" *Id.* ¶ 148.  Since then, NAB officials have complied with the Supreme Court's directives, and have continued to pursue charges against those involved in rental power projects.  Such targets have included Karkey's personnel—even though NAB itself long ago decisively concluded that there was "no evidence" of wrongdoing or corruption on the part of Karkey or any of its employees, and has since uncovered no such evidence.  *Id.* ¶¶ 538-39.

### B.     Relevant Procedural History

### 1.     Karkey Initiates Arbitral Proceedings Before ICSID.

In January 2013, Karkey initiated arbitral proceedings against Pakistan pursuant to the ICSID Convention and the bilateral investment treaty between Pakistan and the Republic of Turkey (the "BIT").[3]  In the BIT, Pakistan expressly consented to the submission of investment disputes by Turkish investors to ICSID, an international arbitral institution that facilitates and supports arbitral and other dispute resolution proceedings.[4]  As noted above, Karkey's dispute with Pakistan was heard by a tribunal composed of three preeminent international arbitrators.

In the Arbitration, Karkey claimed *inter alia* that Pakistan had violated its BIT obligations by expropriating Karkey's contractual rights under the rental power project contract, through the arbitrary decision of Pakistan's Supreme Court declaring such contract void *ab initio*.  For its part, as relevant here, Pakistan argued that Karkey was not entitled to relief because it had fraudulently or corruptly procured the rental power project contract (and thus that

---

[3] Agreement between the Islamic Republic of Pakistan and the Republic of Turkey Concerning the Reciprocal Promotion and Protection of Investments, *i.e.*, the BIT, is available at http://investmentpolicyhub.unctad.org/Download/TreatyFile/2135.

[4] *See About ICSID*, ICSID, https://icsid.worldbank.org/en/Pages/about/default.aspx.  Such proceedings are typically administered pursuant to the ICSID Convention and the ICSID Regulations and Rules.

the Arbitral Tribunal lacked jurisdiction to hear Karkey's claims under the BIT).  Over the

ensuing three years and five months of arbitral proceedings, Karkey produced thousands of pages

of documents, each of the parties submitted multiple rounds of voluminous briefing, and the

parties participated in a two-week "hearing" (trial-equivalent), held in London.  Award (Appl.,

Ex. A) ¶¶ 50, 51, 54, 57.

### 2.      Pakistan Seeks Production Of Backup Tapes.

As part of the disclosure (discovery) process in the Arbitration, the parties exchanged

document requests in accordance with the procedure for doing so established by the Arbitral

Tribunal.  The International Bar Association Rules on the Taking of Evidence in International

Arbitration (2010) (the "IBA Rules") served as a guide to the Arbitral Tribunal and the parties

regarding the extent of the document production that would be permitted in the case.

Importantly, the IBA Rules do not enable U.S.-style discovery, as they require the parties to an

arbitration to identify "a narrow and specific requested category of Documents that are

reasonably believed to exist," and to establish to the satisfaction of the arbitrators that requested

documents are "relevant to the case and material to its outcome."[5]  IBA Rules, Arts. 3.3(a), 3.7.

Among other things, the IBA Rules also permit parties to an arbitration to object to the

production of evidence if it would entail an "unreasonable burden to produce the requested

evidence," or based on "considerations of procedural economy, proportionality, fairness or

equality of the Parties that the Arbitral Tribunal determines to be compelling."  IBA Rules,

Arts. 9.2(c), 9.2(g).

---

[5] The IBA Rules are available at https://www.ibanet.org/Document/Default.aspx?
DocumentUid=68336C49-4106-46BF-A1C6-A8F0880444DC.

The ICSID Convention itself also establishes principles that govern the procedure in an ICSID arbitration.  *See, e.g.*, ICSID Convention, Art. 43 (describing, *inter alia*, a tribunal's discretionary authority to order the production of documents).  Of particular relevance to Pakistan's Application before this Court, Article 43 of the ICSID Convention provides that "the Tribunal *may, if it deems it necessary* at any stage of the proceedings, (a) call upon the parties to produce documents or evidence."  ICSID Convention, Art. 43 (emphasis added).

The ICSID Convention also provides that the ICSID Arbitration Rules, adopted by the ICSID Administrative Council, will govern the conduct of ICSID arbitrations.  *See Id.*, Arts. 6(1)(c), 44; ICSID Arbitration Rules.  Rule 34(2) of the ICSID Arbitration Rules in turn provides that "[t]he Tribunal *may, if it deems it necessary* at any stage of the proceeding:  (a) call upon the parties to produce documents, witnesses and experts."  ICSID Arbitration Rules, Rules 34(2) (emphasis added).  As is clear from the use of the term "may, if it deems necessary," the ICSID Convention and the ICSID Arbitration Rules confer upon tribunals broad discretion to decide whether to order the production of particular documents or witness testimony.  *See also* Christoph H. Schreuer *et al.*, *The ICSID Convention:  A Commentary*, Art. 43, ¶ 19 (2d. ed., 2009); Jean-Christophe Honlet, Barton Legum and Anna Crevon, *Investment Arbitration:  Challenges to the System*, *ICSID Annulment*, *in International Investment Law:  A Handbook*, ¶ 66 (Marc Bungenberg *et al.* eds., 2015).

After document requests were exchanged in the Arbitration, each party produced responsive documents, either as agreed by the parties or as ordered by the Arbitral Tribunal.  Karkey's production was exhaustive, and included numerous documents from the time period between January 1, 2008 and April 30, 2010—*i.e.*, the "Relevant Period" identified in Pakistan's current Application.

Early in the disclosure phase of the arbitration, Karkey voluntarily informed Pakistan that some (but not all) of Karkey's electronic files from prior to April 2010 had been archived to 70 back-up tapes that would not be accessible without undue burden and expense—and potentially might not be accessible at all, given their outdated technology.  Contrary to Pakistan's assertions in its Application (Pakistan's Application for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782 and Supporting Memorandum of Law ("Appl.") at 4[6]), Pakistan did not "discover[]" the existence of the backup tapes, and the mere existence of the backup tapes does *not* (and cannot) in and of itself constitute "evidence of corruption."[7]

Upon Karkey's voluntary disclosure of the existence of the backup tapes, Pakistan complained and ultimately lodged with the tribunal, over the course of the proceeding, four separate requests for Karkey to restore and search the tapes.  In each of those instances, Pakistan was unable to point to any basis for the proposition that restoration and search of the tapes (if even feasible) would yield production of any documents beyond those already produced for the Relevant Period, much less that any such documents would support its allegations of corruption by Karkey.  As set forth below, after fully hearing and considering each such request, the Arbitral Tribunal determined that Pakistan had presented no legitimate basis for demanding the

---

[6] Pakistan's Application does not include page numbers.  For convenience, Karkey designates the first page of the body of Pakistan's Application, after the tables of contents and authorities, as page 1.

[7] Similarly, Pakistan confusingly states that "Karkey relied on the Backup Tapes in other phases of the underlying arbitration and cannot deny their existence."  Appl. at 12.  That statement is misleading and tendentious, as Karkey has never denied the existence of the backup tapes, and indeed it was Karkey itself that voluntarily disclosed their existence to Pakistan.  For the proposition that "Karkey relied on the Backup Tapes in other phases of the underlying arbitration," Pakistan cites to paragraph 325 of the Award, in which the Arbitral Tribunal set out *Pakistan's own* position (not the Tribunal's) that "Karkey had previously relied on these Backup Tapes in resisting certain of Pakistan's requests for disclosure."  Award (Appl., Ex. A) ¶ 325.  However, it is false that Karkey "resisted" Pakistan's requests for disclosure on the basis of the backup tapes; rather, Karkey merely informed Pakistan (in the discovery context) that the tapes existed, and that it would be unduly burdensome for Karkey to restore and search them.

backup tapes, and that requiring their restoration and search for responsive documents would be unduly burdensome for Karkey.  Accordingly, the Arbitral Tribunal exercised its discretion to deny each of Pakistan's applications.  Each of the four requests is briefly described in turn below.

*Pakistan's First Request for Karkey to Restore and Search the Backup Tapes*.  In April 2015, Pakistan filed its first application requesting that the tribunal order Karkey to restore the backup tapes.  At that time, Pakistan explicitly acknowledged that "'Article 9(2)(c) of the IBA Rules allow[ed] the Tribunal to exclude from production any document which it would be unreasonably burdensome to produce.'"  Chedid Decl., Ex. A, ¶ 58.  Pakistan also admitted that "recovering documents from backup tapes is not a straightforward task."  *See id.*

In reply, Karkey explained that "[b]ecause of the number of Backup Tapes and their format, restoring the data on them in a manner that would allow Karkey to search for responsive documents would be extremely costly and time-consuming, and might not even be possible."  *See* Chedid Decl., Ex. A, ¶ 59.  Karkey also explained that at least some pre-April 2010 records were accessible without restoring the backup tapes, and certified that Karkey had already collected, searched, reviewed, and produced all accessible and responsive pre-April 2010 documents.  *See id.*, ¶ 60.  The tribunal declined to order restoration of the backup tapes, but left the door open to later submissions by Pakistan on that issue, as necessary.  *Id.* ¶ 61.

*Pakistan's Second Request for Karkey to Restore and Search the Backup Tapes*.  On July 24, 2015, Pakistan renewed its request for the tribunal to order restoration of the backup tapes.  *Id.* ¶ 62.  In response, Karkey reiterated that it had already collected, reviewed, and produced responsive electronic and hard copy files from prior to April 2010, insofar as such files

had been preserved by individual custodians, or maintained in hard copy.[8]  Karkey also noted

that Pakistan had failed to identify a narrow and specific category of requested documents

reasonably believed to exist on the backup tapes, as required by the IBA Rules.  *See id*.

The Arbitral Tribunal once again denied Pakistan's request, on August 31, 2015.  In

doing so, it concluded that, particularly in light of Karkey's previous production of responsive

documents, and the absence of any evidence of spoliation by Karkey, "restoring 70 pre-April

2010 back-up tapes is excessively burdensome."  Chedid Decl., Ex. A, ¶ 63; Award (Appl.,

Ex. A) ¶ 529.  At the same time, the Arbitral Tribunal required Karkey to submit a declaration

confirming that its production of the available pre-April 2010 documents had indeed been

exhaustive.  Karkey duly complied.  Chedid Decl., Ex. A, ¶ 64.

*Pakistan's Third Request for Karkey to Restore and Search the Backup Tapes, and Its*

*Attempt to Introduce So-Called "New Evidence*."  On December 11, 2015, nearly two months

after Pakistan had filed its final written submission in the Arbitration, and less than three months

before the hearing—in a proceeding that by then had already been ongoing for three years and

two months—Pakistan submitted a *third* request for an order requiring Karkey to restore the

backup tapes.  *See id.* ¶ 65.  In this application, Pakistan also alleged that it had been approached

"by a Lebanese individual" who had allegedly shown (but not given) Pakistan's counsel a

redacted copy of two alleged "Consultancy Agreements" that allegedly suggested the existence

of a "scheme" to secure Karkey's rental service contract through illicit payments.  *Id.*  Pakistan

also claimed that the alleged purveyors of the documents had asked Pakistan for millions of

---

[8] For example, Karkey explained that it had already collected and reviewed hard copy
documents from the period prior to April 2010, including printouts of electronic records and
communications, and that collection and review of the original electronic files, even if available,
would be needlessly redundant.

pounds sterling in exchange for copies of the alleged documents.  *See id.*, ¶ 67; *see also* Award (Appl., Ex. A) ¶ 528.  Pakistan argued that this information concerning a purported bribery "scheme" engaged the tribunal's duty to investigate evidence of corruption—including by reconsidering its previous decisions regarding restoration of the backup tapes.  Chedid Decl., Ex. A, ¶ 65.

Karkey categorically denied the existence of the alleged "scheme" and the purported documents described in Pakistan's application, and explained that Pakistan's application was "based wholly on hearsay, innuendo, and speculation—certainly not a sufficient basis for reopening discovery on the eve of the hearing."  *See id.* ¶ 66.  Karkey again confirmed that it had complied with its disclosure obligations, and that it had preserved all relevant evidence.  *Id.*  Karkey also reemphasized that restoration of the backup tapes would be unduly burdensome, and that potentially it might not even be possible from a technical standpoint.  *See id.* ¶ 70.  After considering both parties' submissions on the matter, the Arbitral Tribunal once determined again that there was no basis for requiring restoration of the backup tapes.  Award (Appl., Ex. A) ¶ 530.

*Pakistan's Fourth Request for Karkey to Restore and Search the Backup Tapes*.  Not content with the outcome of its three earlier failed discovery requests concerning the backup tapes, or that of its failed allegation of "new evidence," Pakistan made yet another discovery application, on the second day of the hearing (March 1, 2016).  Award (Appl., Ex. A) ¶ 531.  Remarkably (and abusively), this March 1, 2016 application included a *fourth* request for restoration of the backup tapes.  *See* Award (Appl., Ex. A) ¶ 531.  In this application, Pakistan asserted—for the first time—that it would be willing to bear the costs of restoring the backup tapes, which Pakistan asserted would be manageable.  *See* Award (Appl., Ex. A) ¶ 531; *see also* Chedid Decl., Ex. A, ¶ 72.

In response, Karkey pointed out, among other things, that Pakistan's own supporting

document revealed that it had been attempting to use the alleged meetings with the individuals

who had offered the alleged "new evidence" as "the hook on which to hang [Pakistan's]

application for disclosure of the Pre-2010 back-up tapes." *See* Chedid Decl., Ex. A, ¶ 73.

Karkey noted that this called into question Pakistan's good faith in renewing its discovery

application in the middle of the hearing. *See id.*

The Arbitral Tribunal rejected Pakistan's fourth request to order Karkey to restore the

backup tapes, having found no support in the alleged "new evidence" to justify "further

investigation" into the issue of corruption—including through restoration of the backup tapes.

*See id.*, ¶ 74; *see also* Award (Appl., Ex. A), ¶ 328.  The Arbitral Tribunal explained that

Pakistan's last-minute arguments did not justify any further delay in the proceedings, given that

the alleged "new evidence" was "very suspicious," and that "*Pakistan's counsel themselves had*

*serious doubts about the authenticity of the alleged new evidence . . . .*"  Award (Appl., Ex. A),

¶ 536 (emphasis added).  The Arbitral Tribunal further found that

> [i]n reality, Pakistan was asking the Tribunal to embark upon an investigation as
> to the existence of corruption two months before the Hearing and then at the
> Hearing, after almost three years of arbitral proceedings.  *This request was based*
> *on allegations of suspicion of corruption and declarations of informants of highly*
> *suspect credibility, after the Pakistani authorities, with powers considerably*
> *greater than those of the Tribunal, had failed to establish the existence of such*
> *corruption after several years of investigation.*

*Id.* ¶ 537 (emphasis added).  In that regard, the Arbitral Tribunal emphasized that "NAB itself

concluded that there was *no evidence of any wrongdoing by Karkey* under [Pakistan's anti-

corruption law, the National Accountability Ordinance], 'after a detailed examination of all

accounts and documents.'"  *Id.* ¶ 539 (emphasis added).

### 3.      The Tribunal Rules In Karkey's Favor, And Pakistan Seeks Annulment.

On August 22, 2017, the Arbitral Tribunal rendered an award in Karkey's favor, ordering Pakistan to pay Karkey US$500,693,567.17 (plus interest), comprising damages and a portion of Karkey's costs.  *See* Award (Appl., Ex. A), ¶ 1081.  In determining that Pakistan should bear a portion of Karkey's costs and legal fees (more than $10 million), the Arbitral Tribunal specifically took into account Pakistan's conduct with respect to its disclosure applications.  *See id.* ¶¶ 1066–1067.  On October 27, 2017, Pakistan filed an application with ICSID for annulment of the award pursuant to Article 52 of the ICSID Convention.  Pursuant to its annulment procedures, ICSID convened an *ad hoc* committee made up of three international law practitioners appointed by ICSID (none of whom were arbitrators or otherwise involved in the underlying Arbitration), and the relevant proceeding is pending.

The purpose of annulment proceedings is limited to ensuring the procedural integrity of the arbitral process.  Annulment committees do not conduct appellate review of awards or reexamine the substance of the parties' dispute.  Thus, while an annulment committee is authorized "to annul the award or any part thereof" (ICSID Convention art. 52(3)), it may do so only on the basis of five specific and narrow grounds defined by the ICSID Convention itself, which include that the tribunal "manifestly exceeded its powers," that there was a "serious departure from a fundamental rule of procedure," and that "the award has failed to state the reasons on which it was based."  *Id.* art. 52(1).  The record in an annulment proceeding generally consists of the record from the underlying arbitration, and accordingly does not feature the introduction of new evidence.  In the present dispute between Pakistan and Karkey, the Annulment Proceeding is currently ongoing, and Pakistan is scheduled to file its last written submission in that proceeding on November 30, 2018.

### 4.     Pakistan Seeks Production Of The Backup Tapes From Arnold & Porter Under Section 1782.

On August 8, 2018, Pakistan submitted to this Court its *ex parte* Application for discovery pursuant to section 1782.  That statute permits, but does not require, a U.S. district court to order discovery for use in a proceeding in a foreign or international tribunal.  Pakistan has requested leave to serve discovery requests on Arnold & Porter, seeking disclosure of documents that Pakistan assumes (incorrectly) may be in Arnold & Porter's possession, and that, based on pure speculation by Pakistan, would demonstrate corrupt activities by Arnold & Porter's client, Karkey.  In its Application, Pakistan takes diametrically opposed positions on whether it is seeking documents exclusively from the backup tapes, or broader discovery.[9]

On September 25, 2018, this Court denied Pakistan's *ex parte* Application, holding that *ex parte* review of the Application was inappropriate, given the need for additional facts and legal analysis. Dkt. 4.  Without reaching the merits of the Application, the Court ordered Pakistan to serve a copy of both the Order and the Application on Arnold & Porter if Pakistan wished to proceed with its request for discovery under section 1782.  *Id.* at 3.  Pakistan served its Application and the Court's Order on Arnold & Porter on October 9, 2018.

### ARGUMENT

### I.     Arnold & Porter Does Not Have Possession, Custody, Or Control Of The Backup Tapes.

As the party seeking production under section 1782, Pakistan bears the burden of establishing Arnold & Porter's possession, custody, or control over the documents at issue.  *In re*

---

[9] *See, e.g.*, Appl. n.3 ("To be clear, Pakistan's Application is limited to the emails and other electronic documents maintained on the Backup Tapes related to the RPP Program, which is the focus of NAB's investigation. . . .  That being said, Pakistan cannot limit itself to the Backup Tapes.").

*Barnwell Enterprises Ltd.*, 265 F. Supp. 3d 1, 16 (D.D.C. 2017).  Here, Pakistan cannot do so, for the simple reason that Arnold & Porter in fact does not have possession or custody of the backup tapes.  Ware Decl. ¶ 4.  A party "[o]bviously . . . is not obliged to produce anything that is not in [its] possession, custody, or control."  *Doe v. District of Columbia*, 231 F.R.D. 27, 35 (D.D.C. 2005); Fed. R. Civ. P. 34(a)(1).

Pakistan suggests (Appl. at 1, 4) that Arnold & Porter "acquired access" to the tapes during the course of its representation of Karkey in the underlying arbitral proceedings.  Even if this were true (which it is not), it would not render the tapes within Arnold & Porter's *legal* control.  Attorneys do not have the "legal right to control or obtain" documents that belong to their clients.  *Tavoulareas v. Piro*, 93 F.R.D. 11, 20 (D.D.C. 1981).  Pakistan cites no authority holding otherwise.

Pakistan's threat (Appl. at 12) to seek depositions and other forms of discovery "to ascertain the location" of the evidence it seeks is unsupported by any authority or precedent.  Even apart from the undue burden and intrusion on the attorney-client relationship discussed below, *infra* at 35, section 1782 does not entitle a party to an arbitration (or any legal dispute) to depose the *attorneys* of its adversary in order to search for potential opportunities to conduct discovery on the adversary.[10]  The plain language of section 1782 makes this clear in stating that what may be discovered is only evidence "*for use* in a proceeding."  28 U.S.C. § 1782(a) (emphasis added); *see Mees v. Buiter*, 793 F.3d 291, 301 (2d Cir. 2015) ("for use" requirement satisfied by showing that the materials sought are to be used at some stage of a foreign

---

[10] To the knowledge of undersigned counsel, no court has ever granted a request, similar to Pakistan's, to use section 1782 to conduct discovery of an adversary's *attorneys* in order "to ascertain the location" of electronic media that may or may not contain relevant documents.

proceeding).  Discovery that is aimed simply at determining the location of electronic media that may or may not contain relevant documents plainly does not satisfy the "for use" requirement.

In short, to the extent that Pakistan's Application is—as Pakistan itself represents— "limited to the emails and other electronic documents maintained on the Backup Tapes" (Appl. at 4 n.3), it must be denied, because Arnold & Porter does not have custody or control of such tapes.

## II.      This Court Lacks Statutory Authority To Grant Pakistan's Application.

Pakistan's Application fails for the additional reason that Pakistan does not satisfy section 1782's requirement of "a proceeding before a foreign or international tribunal . . . ."  28 U.S.C. § 1782(a).  Pakistan claims (Appl. at 6) that it seeks the requested discovery for use in (i) "ongoing arbitration proceedings" before ICSID, and (ii) the NAB investigation in Pakistan. As explained below, neither qualifies as a foreign or international proceeding within the meaning of section 1782.

### A.      Section 1782 Does Not Extend To The Annulment Proceeding.

In permitting federal district courts to order discovery "for use in a proceeding before a foreign or international tribunal," section 1782 does not define the term "tribunal."  However, nothing in the statute's history or purpose indicates that Congress intended to permit federal discovery in support of proceedings before a *sui generis*, supra-national arbitral institution such as ICSID—a body that did not exist when section 1782 was enacted in 1964.

Whether section 1782 applies to international arbitral proceedings at all is a matter of significant dispute.  The Second and Fifth Circuits—the only two courts of appeals to have addressed the issue—have observed that there is no evidence that Congress intended section 1782 to cover the "then-novel arena" of international arbitration, and accordingly have held that section 1782 does not authorize federal district courts to order discovery in aid of private

international arbitral proceedings.  *See Nat'l Broadcasting Co. v. Bear Stearns & Co.*, 165 F.3d 184, 188 (2d Cir. 1999); *Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880, 882 (5th Cir. 1999).[11]  Such an expansion of federal judicial authority "would not have been lightly undertaken by Congress without at least a mention of this legislative intention."  *Nat'l Broadcasting Co.*, 165 F.3d at 190.

Moreover, expanded discovery through U.S. federal courts would override the more limited discovery procedures that customarily apply to arbitral proceedings, and that applied in the Arbitration (and Annulment Proceeding) at issue here.  *Biedermann*, 168 F.3d at 883; *Nat'l Broadcasting Co.*, 165 F.3d at 192.  Thus, extending discovery under section 1782 to private arbitral tribunals—especially in the present circumstances, where the Arbitration has concluded and an Award has already been issued—would be sharply at odds with the advantages of speed, economy, and efficiency that distinguish private arbitration from domestic litigation.  It also would effectively have the perverse effect of permitting broader discovery in aid of foreign arbitration than is available in domestic U.S. arbitrations.  *Biedermann,* 168 F.3d at 882–83; *see also Nat'l Broadcasting Co.*, 165 F.3d at 190–91.  This Court should not assume that Congress intended such anomalous results, absent clear legislative intent.

The Supreme Court in *Intel Corp. v. Advanced Micro Devices*, 542 U.S. 241 (2004), did not disturb the Second and Fifth Circuits' holdings that section 1782 does not extend to private international arbitrations.  While some district courts have concluded that the Supreme Court's functional approach to resolving questions regarding the scope of section 1782 opened the door

---

[11] The Eleventh Circuit in *In re Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 685 F.3d 987 (11th Cir. 2012) reached the opposite conclusion in the context of discovery sought for use in a private arbitration pending in Ecuador.  That decision was vacated and superseded, and the superseding opinion did not decide whether that arbitration met the statutory requirement.  747 F.3d 1262, 1269 (11th Cir. 2014).

to discovery in aid of private international arbitral proceedings, that question was not before the

Court in *Intel*. *See In re Grupo Unidos Por El Canal, S.A.*, No. 14-mc-00226-MSK-KMT, 2015

WL 1810135, at *6 (D. Colo. Apr. 17, 2015) (citing cases).  Instead, the district courts adopting a

broader interpretation of section 1782 rely on the Supreme Court's passing citation of a law

review article that opines that the statute's reference to "tribunal" encompasses arbitral

tribunals.[12]  *See Grupo Unidos*,  2015 WL 1810135, at *6.  But as one district court has stated in

rejecting such interpretation, it is implausible to suggest that "the Supreme Court would . . . have

expanded § 1782 to permit discovery assistance in private arbitral proceedings and reversed

*Nat'l Broadcasting Co.* and *Biedermann*—without even acknowledging their existence—in a

parenthetical quotation supporting an unrelated proposition."  *In re Operadora DB Mexico, S.A.*

*de C.V.*, No. 6:09-cv-383-Orl-22GJK, 2009 WL 2423138, at *11 (M.D. Fla. Aug. 4, 2009).

Regardless of whether or not section 1782 may be fairly read to extend to private

international arbitral proceedings, this Court should not further expand section 1782's reach by

extending its application to proceedings before ICSID.  As an initial matter, ICSID—which was

established in 1966—did not even exist when Congress enacted section 1782.  But from the

outset, the original ICSID contracting parties (including the United States) designed ICSID as a

self-contained, supranational dispute resolution system that is "completely detached from the

laws of any particular state, including the state in which the arbitration takes place."  *See* Eric De

Brabandere, *Investment Treaty Arbitration as Public International Law* 52 (2014).  The ICSID

system contemplates absolutely no role for, or involvement by, domestic courts in ICSID arbitral

---

[12] The article cited for that proposition pre-dates the decisions of the Second and Fifth Circuits
by at least three decades, and is at odds with those courts' analysis of the legislative history of
section 1782.  *See Intel Corp.*, 542 U.S. at 258 (citing Hans Smit, *International Litigation Under
The United States Code*, 65 Colum. L. Rev. 1015, 1026–27 & nn.71, 73 (1965)).

proceedings, and the only relevance of domestic courts is at the stage of enforcement of the award, once the arbitral proceeding has already concluded. *Id.* Given the foregoing, and especially since the ICSID system was created pursuant to an international treaty, this Court should not expand federal judicial authority to interfere with ICSID's carefully designed dispute resolution mechanism.

In any event, and at a minimum, the application of section 1782 is particularly unsuitable to ICSID *annulment* proceedings. Even if section 1782 could be deemed to apply to ICSID proceedings, Pakistan would need to demonstrate that the evidence sought is "for use" in the Annulment proceeding. "[A] request that fails to show that the materials sought will be of any use in the foreign proceeding" does not satisfy the "for use" requirement. *Mees*, 793 F.3d at 299 n.10. As explained above, ICSID annulment proceedings by design rely on the record of the underlying arbitration, and generally do not contemplate the introduction of new evidence. Indeed, the Annulment Committee in the case between Karkey and Pakistan expressly stated in its Procedural Order No. 1 that it "expects that the Parties will primarily refer to the evidentiary record of the original arbitration" and that "[i]n principle, no new evidence shall be admitted in this proceeding." Annulment Procedural Order No. 1 (Appl., Ex. N) ¶ 16.4. Furthermore, the parties to the Annulment Proceeding are required to submit requests to introduce new evidence in advance of their written submissions. Annulment Procedural Order No. 1 (Appl., Ex. N), ¶ 16.4 & Annex A. Pakistan's last opportunity to do so was on November 2, 2018, but Pakistan did not submit any such request.[13]  *Id.* In these circumstances, it is highly doubtful—if not

---

[13] Pakistan submitted such a request in May 2018—before filing its section 1782 Application—in order to submit new evidence with its Memorial on Annulment, which was filed on June 1, 2018. Karkey opposed Pakistan's request and the Annulment Committee rejected the request.

impossible—that Pakistan would be able to use in the Annulment Proceeding any "evidence" it would be permitted to obtain as a result of its Application.

In sum, because section 1782 does not apply to the Annulment Proceeding, and because in any event whatever evidence Pakistan were able to obtain pursuant to its Application would not be "for use" in such proceeding, such Application fails and must be rejected.

### B.       The NAB Investigation Is Not A Legitimate Foreign Proceeding.

Pakistan alternatively asserts that it seeks evidence for use in an investigation conducted by Pakistan's NAB that Pakistan contends is still ongoing, six years after it was initiated in 2012. But section 1782's reference to "foreign proceedings" necessarily presupposes a valid proceeding, *i.e.*, one not conducted in bad faith or purely for the purpose of harassing political opponents. *See United States v. Sealed 1, Letter of Request for Legal Assistance from the Deputy Prosecutor General of the Russian Federation*, 235 F.3d 1200, 1205–06 (9th Cir. 2000).

There is no legitimate basis for the ongoing NAB investigation.  NAB initiated its inquiry in 2012, following an order to do so by the Pakistan Supreme Court in its arbitrary and legally invalid decision declaring the rental power project contracts void *ab initio*.  After several months of investigation, NAB concluded that there was no evidence of corruption or wrongdoing by Karkey.  The Director General of NAB accordingly attested in the Deed that there was "no basis or evidence for proceeding(s) by NAB or any of the other Parties or GoP [Government of Pakistan] entities against KARKEY and/or its project/investment and that NAB has completed and closed its enquiry in respect of KARKEY."  Award (Appl., Ex. A) ¶¶ 136; 138.  As explained above, NAB also issued a No Objection Certificate confirming that it was satisfied that Karkey had no liability under Pakistan's anti-corruption law, and that NAB had "completed and closed its inquiry [in respect of Karkey]."  *Id.* ¶ 138.

24

As described above, NAB only recommenced an investigation into Karkey's activities upon extreme, inappropriate, and politically motivated pressure from the Supreme Court of Pakistan—pressure that NAB's Director General himself acknowledged was creating a "danger of unfair investigation." *Supra* at 8–9.  In the more than half a decade since reopening the investigation, NAB has yet to uncover even a shred of evidence of corruption, yet it continues to pursue these false and frivolous charges.  And now, for the first time since the investigation was first initiated, and in the more than three years since Pakistan learned of the existence of the backup tapes, Pakistan—through its *arbitration* counsel—purports to seek the assistance of this Court in its hopeless pursuit for evidence for its domestic prosecution.  NAB's vexatious investigation—which emerged from a decision by Pakistan's Supreme Court that the Arbitral Tribunal expressly determined to have been arbitrary, expropriatory, and in breach of international law—cannot be the kind of foreign proceeding for which Congress intended federal courts to lend assistance.[14]

## III.   This Court Should Decline To Exercise Its Discretion To Order Discovery Under Section 1782.

Even assuming that the statutory requirements of section 1782 can be satisfied, "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Intel Corp.*, 542 U.S. at 264.  Instead, district courts have broad discretion to determine whether judicial assistance to foreign or international proceedings is warranted.  In that regard, it may be relevant whether the party from whom discovery is sought is a participant in the foreign proceeding, since "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id.*  The Supreme Court has also instructed

---

[14] At a minimum, the sham nature of this investigation provides ample ground for a discretionary denial of Pakistan's Application for section 1782 discovery.  *See infra* at 31–31.

courts to consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Id.* District courts may also consider whether the section 1782 discovery request is an attempt to circumvent foreign restrictions on evidence-gathering, or other relevant policies of either the United States or a foreign country, and whether the requested discovery is "unduly intrusive or burdensome." *Id.* at 265. Here, each of these considerations weighs against granting Pakistan's request.

## A. Karkey, Arnold & Porter's Client, Is A Participant In The Foreign Proceedings.

Pakistan observes (Appl. at 9) that Arnold & Porter is not a participant in the proceedings, and argues that this weighs in favor of granting its Application. But while the need for section 1782(a) assistance is "generally" more apparent when the party from whom discovery is sought is not a participant in the foreign proceeding, that observation is premised on the notion that the third party's documents (here, Karkey's) "may be unobtainable absent § 1782(a) aid." *See Intel Corp.*, 542 U.S. at 264. Courts accordingly have denied section 1782 assistance where all of the documents sought were within the foreign tribunal's reach, even if the parties against whom discovery was sought in U.S. court were not participants in the foreign proceedings. *See In re Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006).

That is precisely the case here. The backup tapes have never been "unobtainable" without this Court's assistance. To the contrary, the backup tapes were fully within the reach of the Arbitral Tribunal during the Arbitration, and in principle have been within the Annulment Committee's reach during the Annulment Proceeding. Pakistan's four requests during the Arbitration for restoration of the backup tapes were denied because they were unduly burdensome—not due to any lack of authority on the part of the Arbitral Tribunal to grant the

requested disclosure.  Similarly, in the Annulment Proceeding, the Annulment Committee in principle has the authority and discretion to order Karkey to produce documents "if it deems necessary."  *See* ICSID Arbitration Rule 34(2)(a) ("The Tribunal may, if it deems necessary at any stage of the proceeding, call upon the parties to produce documents, witnesses, and experts . . . .").  However, Pakistan has not raised any such request, and the appropriate time for doing so has now passed.[15]  *See* ICSID Arbitration Rule 53 (providing that the ICSID Arbitration Rules, including Rule 24, apply *mutatis mutandis* to annulment proceedings).  Pakistan therefore had a direct procedural avenue at ICSID for making its request from Karkey, and should not now be permitted to circumvent the arbitral proceedings—and the conclusions of the ICSID arbitrators—through its section 1782 Application.

For the foregoing reasons, it is "unnecessary and improper" to enlist this Court to compel production of materials from Karkey's U.S. counsel (which, in any event and as noted, does not have possession, custody, and control of the materials Pakistan appears to be requesting).  *In re Microsoft Corp.*, 428 F. Supp. 2d at 194.

### B.     The Character And Nature Of The Foreign Proceedings Weigh Against Section 1782 Assistance.

The nature and character of the foreign proceedings invoked by Pakistan likewise counsel against granting the petition.

### 1.     The ICSID Annulment Proceeding

The character of the Annulment Proceeding also weighs against section 1782 discovery. As explained above, new evidence is generally not considered in an annulment proceeding.

---

[15] Pakistan no doubt is aware that any such request very likely would have been denied, given that the requested documents are in no way "necessary" to resolution of the Annulment Proceeding.  *See infra* at 28–30.

Indeed, in the Annulment Proceeding for which Pakistan purportedly seeks assistance, the Annulment Committee has already denied one request by Pakistan to introduce new evidence, and Pakistan's final opportunity under the applicable procedural timetable to request to add new evidence has now passed (absent "exceptional circumstances").[16]  Pakistan misleadingly states that "[t]he Annulment Committee has expressly allowed Pakistan to present new evidence in support of its annulment request" (Appl. at 7), eliding the Annulment Committee's express admonition that it "expects that the Parties will primarily refer to the evidentiary record of the original arbitration" and that "[i]n principle, no new evidence shall be admitted in this proceeding."  Annulment Procedural Order No. 1 (Appl., Ex. N), ¶ 16.4.

Furthermore, apart from the restrictions on the introduction of new evidence in ICSID annulment proceedings, the substantive scope of such proceedings is extremely narrow. Annulment is an exceptional remedy, and may be sought only on five narrow technical grounds identified in an exhaustive list that is explicitly set forth in the ICSID Convention.  ICSID Convention, art. 52(1).  Annulment committees do not conduct appellate review of awards, as the ICSID Convention does not contemplate review of the merits of an award for legal or factual error.  Rather, annulment is concerned only with preserving the procedural integrity of the decisional process.  *See generally* ICSID, Updated Background Paper on Annulment for the Administrative Council of ICSID (May 5, 2016), at 31–49.[17]

---

[16] Annulment Procedural Order No. 1 allows the parties to "make a reasoned written request to file additional documentary evidence" after the close of written submissions "[i]n exceptional circumstances."  Appl. Ex. N, ¶ 16.1.

[17] Available at:  https://icsid.worldbank.org/en/Documents/resources/Background% 20Paper%20on%20Annulment%20April%202016%20ENG.pdf.

As relevant here, Pakistan contends in the Annulment Proceeding that the Arbitral

Tribunal departed from fundamental rules of procedure by denying production of the backup

tapes, which Pakistan speculates might have contained "fundamental evidence" supporting its

corruption claims.  RFA (Appl., Ex. I), ¶ 88.  In this connection, Pakistan claims (Appl. at 7) that

the Arbitral Tribunal "recognized" that, "[i]f genuine, those [records] would be evidence that

Pakistan has been the victim of a large-scale fraud by Karkey (and others) which goes to the very

heart of this Tribunal's jurisdiction."  However, the Arbitral Tribunal recognized no such thing.

Pakistan quotes paragraph 528 of the Award, but the section in which that paragraph appears

simply summarizes *Pakistan's own arguments in the Arbitration*; it does not purport to represent

the views or analysis of the Arbitral Tribunal itself.

Pakistan also argues in the Annulment Proceeding that allegedly fraudulent conduct by

Karkey deprived the Arbitral Tribunal of jurisdiction, and that the Arbitral Tribunal's exercise of

jurisdiction was therefore a manifest "excess of powers."  *See* Appl. at 10.  But annulment

proceedings are not a forum for relitigation of claims and arguments advanced in an arbitration.

The Annulment Committee's review is restricted to ensuring procedural fairness and correcting

obvious errors in assertion of jurisdiction "evident on the face of the award."  *See* ICSID

Background Paper, at 55 & nn.153-154.  Neither of Pakistan's contentions in the Annulment

Proceeding requires Pakistan to obtain and introduce the actual evidence it sought to obtain and

have considered in the underlying Arbitration.

Finally, this Court should be especially wary of permitting discovery here because

international arbitral proceedings are a creature of consent, and the parties have the flexibility to

fashion their own procedural rules, including rules governing document production.  *In re*

*Application of Caratube Int'l Oil Co.*, 730 F. Supp. 2d 101, 106 (D.D.C. 2010).  Accordingly,

courts should be "reluctant . . . to interfere with the parties' bargained-for expectations

concerning the arbitration process" by ordering discovery under section 1782. *Id.* "The purpose of arbitration in large part is to have simplified, expedited proceedings and courts should be reluctant to adopt rules which interfere with the accomplishment of those purposes." *Id.* (citation omitted); *see also Biedermann*, 168 F.3d at 883.

This Court should not allow Pakistan to circumvent the bargained-for procedures that governed the Arbitration and that apply to the Annulment Proceeding under way. Pakistan tries (Appl. at 10–11 n.5) to distinguish *Caratube* by claiming that Karkey, as the investor, had the "unilateral right" to seek arbitration of its claims (thus suggesting that Pakistan had no choice in the forum). But Pakistan made a choice when it entered into the BIT with Turkey, and it expressly consented therein—prospectively—to submit investment disputes with aggrieved Turkish investors to ICSID arbitration. *See* BIT, art. 10. For all intents and purposes, this is no different from a private party opting into arbitration by entering into a contract with an arbitration clause.[18]

### 2.     The NAB Investigation

As for the NAB investigation, Pakistan makes the uncontroversial assertion (Appl. at 10) that "both the United States and Pakistan have an interest in enforcing their anti-corruption laws through criminal prosecution." But as already explained, *supra* at 8–9, the NAB investigation is not aimed at legitimate enforcement of Pakistan's anti-corruption laws; rather, it is a politically

---

[18] Often, States expressly extend a standing offer of consent to submit investor disputes to ICSID arbitration, whether by including appropriate language in their bilateral investment treaties, in domestic statutes, or in foreign investment contracts, and such offer of consent is said to be accepted by the investor when it files a request for arbitration. *See, e.g.*, C. Schreuer *et al.*, *The ICSID Convention: A Commentary* (Oxford University Press (2d. ed.), 2009), Art. 25, ¶ 427 ("While the [bilateral investment] treaty on its own cannot amount to consent to [ICSID's] jurisdiction by the parties to the dispute, it may constitute the host State's offer to do so. This offer may then be taken up by a national of the other State party to the treaty."). Pakistan and Turkey extended such an offer of consent in the BIT, which Karkey accepted when it filed its request for arbitration against Pakistan. BIT, Art. VII.2(a).

motivated harassment campaign against Karkey stemming from an arbitrary and illegitimate decision by Pakistan's Supreme Court.

Furthermore, Pakistan's Application appears to be intended more to frustrate Karkey's attempts to enforce the Award than to uncover evidence of corruption for purposes of the endless NAB investigation.  This is apparent from the fact that (i) it is Pakistan's *arbitration* counsel that has made the Application, (ii) NAB is not expressly identified as a party, and (iii) NAB itself has not previously made such an application, despite the fact that its investigation has dragged on for more than six years.  Pakistan's true intent also seems apparent from the fact that Pakistan has made multiple gratuitous references to the present Application in its motion to dismiss Karkey's Complaint to enforce the Award in the United States, which motion is currently pending in the District Court for the District of Columbia.  *See Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, Civ. Action No. 18-01461(RJL), Dkt. 11 at 7 n.3; *id.*, Dkt. 18 at 11.

As the Ninth Circuit has recognized, section 1782 "provides considerable discretion to district courts to decline to order U.S. authorities to assist in situations where the foreign government has, for example, insufficient basis to believe that evidence may be found here, or is simply seeking to harass political opponents."  *Sealed 1*, 235 F.3d at 1205.  That is precisely the case here, where the only reason for the NAB proceedings is continuous political pressure and harassment of Karkey with frivolous charges in an effort by Pakistan to evade its international law obligation to compensate Karkey for the expropriation of Karkey's contract rights and of its vessels.  This Court should not lend credence to these bad-faith, vexatious investigations by authorizing Pakistan to secure discovery in a U.S. federal court pursuant to section 1782.

**C.     Pakistan's Apparent Purpose For Making Its Section 1782 Application Is To Circumvent The Arbitral Tribunal's Reasoned Decisions Denying Pakistan's Requests For Restoration Of The Backup Tapes.**

This Court should also decline to grant Pakistan's Application because such application in essence seeks to circumvent the Arbitral Tribunal's reasoned denial of Pakistan's multiple requests in the Arbitration for restoration of the backup tapes. *See Intel Corp.*, 542 U.S. at 264. As explained above, Pakistan lodged four separate requests with the Arbitral Tribunal to order Karkey to restore and search the backup tapes. Each time, consistent with the IBA Rules that guided the discovery process in the Arbitration, the Arbitral Tribunal exercised its discretion to deny Pakistan's request, including on the basis that the request was unduly burdensome.

Pakistan's present Application again focuses on the backup tapes, and thereby seeks to collaterally attack the Arbitral Tribunal's decisions. Pakistan's apparent effort to undermine the Arbitral Tribunal's reasoned decisions is contrary to the purpose of section 1782, and this Court should not lend its aid to Pakistan in that endeavor.

**D.     The Discovery Sought Would Be Unduly Intrusive And Burdensome.**

This Court should also decline to exercise discretion to grant Pakistan's Application because the discovery sought would be unduly intrusive, would be unreasonably cumulative and duplicative, and would impose undue costs and burdens on Arnold & Porter. *Intel Corp.*, 542 U.S. at 265.

Federal discovery is limited to a "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *Mees*, 793 F.3d at 202 (applying the standards of Rule 26 to section 1782

discovery request).  Discovery may be denied where:  "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."  Fed. R. Civ. P. 26(b)(2)(C).

First, Pakistan appears to be seeking extremely broad discovery.  Pakistan disclaims (Appl. at 12) a "fishing expedition into Karkey's general finances or activities outside of the corruption allegations," and states (*id.* at 4 n.3) that its Application is "limited to the emails and other electronic documents maintained on the Backup Tapes related to the RPP Program, which is the focus of the NAB investigation."  Yet in its very next sentence, Pakistan also states that it "cannot limit itself to the Backup Tapes."  *Id.*

Even if—true to its word—Pakistan is indeed seeking only documents maintained on the backup tapes, its requests would still constitute an unduly burdensome and unreasonably cumulative fishing expedition.  Indeed, Pakistan has offered no basis—other than its unsupported allegations of corruption—to support its proposition that the backup tapes would contain anything different from, or additional to, what had already been produced by Karkey during the Arbitration.  As explained above, in the context of the arbitral proceeding at ICSID, Karkey already produced all responsive and accessible documents from the January 1, 2008 to April 30, 2010 timeframe.  Pakistan's requests here are thus duplicative and should be rejected.  Fed. R. Civ. P. 26(b)(2)(C)(i).  Nor has Pakistan offered any support for the notion that the backup tapes

would actually contain documents substantiating its unfounded allegations of corruption. This is a prototypical fishing expedition, which should not be indulged by this Court.[19]

The fact that Pakistan is requesting leave to serve subpoenas and interrogatories on Arnold & Porter suggests that Pakistan hopes to receive discovery *beyond* the backup tapes. Thus, the subpoena seeks "all documents" in certain categories from the "relevant time period," and none of the subpoena requests is actually limited to documents stored on the backup tapes. *See, e.g.*, Proposed Order ¶ 2 ("All documents related to the negotiation of any agreement of any sort between Karkey and any entity owned or controlled by Pakistan during the Relevant Period"); *id.* ¶ 6 ("All documents showing any payments of money or any item of value by Karkey to any person or entity with the purpose of such payment reaching Karkey's employees or agents in Pakistan during the Relevant Period."). Pakistan nowhere provides a specific description of responsive documents that it reasonably believes exist—whether on the backup tapes or anywhere else. Nor does it explain how these broad categories of evidence are reasonably tailored to the narrow issues before the Annulment Committee; indeed, the subpoena requests are far broader than Pakistan's requests for production during the Arbitration. Accordingly, granting the Application would have the illogical effect of conferring upon Pakistan a broader range of discovery than it was able legitimately to obtain in the very arbitration that it now invokes as the relevant "foreign proceeding."

Pakistan also seeks to serve interrogatories on Arnold & Porter regarding such extraneous matters as the Firm's data retention policies, and its representation of or relationship to other

---

[19] Indeed, some of Pakistan's specific requests are even worse than a fishing expedition, and would more accurately be characterized as pre-fishing expedition requests. For example, Pakistan seeks to propound interrogatories to, among other things, identify all individuals who have ever had access to the backup tapes, which, if answered, would no doubt lead to follow-on discovery requests by Pakistan.

parties.  Such requests are not only unduly burdensome, but also likely to intrude upon attorney-client privilege.  There is no justification for Pakistan to seek or obtain information about Arnold & Porter's relationships to other parties, or its data retention policies, and Pakistan never explains how or why that information is at all relevant to the purported purposes for which it seeks discovery.  Accordingly, its request for this information should likewise be rejected.

In all events, responding to Pakistan's intrusive discovery requests would impose undue burdens on Arnold & Porter.  An order by the Court for Arnold & Porter to review and produce any responsive documents that are, in fact, in Arnold & Porter's custody (as a result of its representation of Karkey) would require both Arnold & Porter and Karkey to needlessly divert time and resources to essentially duplicate the document review and production that Arnold & Porter and Karkey already undertook in connection with the Arbitration.[20]  In this connection, it bears noting again that the Arbitral Tribunal required Pakistan to pay Karkey more than US$10 million as contribution to Karkey's legal fees, and costs and expenses (Award (Appl, Ex. A, ¶ 1081(xv), (xvi))—including on the basis of Pakistan's vexatious discovery requests during the Arbitration—and Pakistan has not paid a dime of that amount to date.  Neither Arnold & Porter nor Karkey would have the right in the present context to seek contribution from Pakistan (as Karkey was able to do in the ICSID arbitration) for any costs incurred in responding to Pakistan's onerous and meritless discovery requests under section 1782.

Finally, Pakistan's conclusory statement (Appl. at 12) that providing access to the tapes would be a "simple task" is undercut by Pakistan's own acknowledgment during the arbitral proceedings that "recovering documents from backup tapes is not a straightforward task."  *See*

---

[20] Furthermore, Pakistan's threatened depositions would impose undue burden on the impacted attorneys and legal personnel.

Chedid Decl., Ex. A ¶ 58.  The Arbitral Tribunal agreed, holding that "restoring 70 back-up tapes is excessively burdensome," particularly since Karkey had already collected and reviewed available documents from the same period and produced all responsive documents, and had further certified that its review had been exhaustive.  *Id.* ¶ 63.

There is no basis for a different conclusion here.  Pakistan represents (Appl. at 12) that it is willing to pay for the restoration and copying of the backup tapes, but that cost is secondary to the undue burden in terms of commitment of time and resources that searching for and producing responsive, non-privileged documents would impose on Arnold & Porter and Karkey, and the utter intrusiveness of Pakistan's requests on Arnold & Porter's legal practice.  This Court should reject Pakistan's efforts to circumvent the ICSID Convention system and the reasoned decisions by the Arbitral Tribunal, and accordingly should deny Pakistan's Application.

## CONCLUSION

For the foregoing reasons, Pakistan's Application for an order permitting discovery pursuant to section 1782 should be denied.


Dated:  November 5, 2018


Respectfully submitted,

*/s/ Paolo Di Rosa*

Paolo Di Rosa (D.C. Bar # 434547)
Sally Pei (D.C. Bar # 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
paolo.dirosa@arnoldporter.com
sally.pei@arnoldporter.com

Maria Chedid*
Anton A. Ware*
John Muse-Fisher*
ARNOLD & PORTER
  KAYE SCHOLER LLP
Three Embarcadero Center
10th Floor
San Francisco, CA 94111
(415) 471-3100
(415) 471-3400 (fax)
maria.chedid@arnoldporter.com
anton.ware@arnoldporter.com
john.muse-fisher@arnoldporter.com

Kabir Duggal*
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(212) 836-8689 (fax)
kabir.duggal@arnoldporter.com

*Counsel for Respondent*

**Pro hac vice* application pending