UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_In re_ Application of THE ISLAMIC
REPUBLIC OF PAKISTAN for an
Order Permitting Discovery Pursuant
to 28 U.S.C. § 1782,

    Petitioner,

v.

ARNOLD & PORTER KAYE
SCHOLER LLP,

    Respondent.

Misc. Action No. 18-103 (RMC)

**MEMORANDUM OPINION**

The Islamic Republic of Pakistan submits an Application to this Court for an order permitting it to take discovery of the law firm of Arnold & Porter Kaye Scholer LLP. Pakistan contends that Arnold & Porter possesses backup tapes of electronic records that evidence corrupt activities by the firm's client, Karkey Karadeniz Elektrik Uretim A.S., in relation to the award of a large government contract from Pakistan in 2008. Those alleged corrupt activities are the subject of both an official Pakistani corruption investigation and an international arbitration. Arnold & Porter objects to discovery on multiple grounds, most crucial being that it does not now have, and has never had, possession, custody, or control of the backup tapes. For the reasons discussed below, the Court will grant in part and deny in part the Application.

    **I.    BACKGROUND**

There are no disputes about the facts below unless identified.

1

Pakistan experienced a major energy crisis between 2006 and 2007. In response, it initiated a policy of power generation through the Rental Power Projects Program. Karkey builds and operates "Powerships"—ships with mounted power generation equipment that can be sailed around the world and connected to the electric grid of countries in need of power. Like other power providers, Karkey bid for and was awarded a contract (as specific to Karkey, the Contract) with Lakhra Power Generation Company Ltd., a company owned by the Pakistani government, to set up ship-mounted power generation units near Karachi, Pakistan.

When a member of Parliament complained to the Supreme Court of Pakistan about the Rental Power Projects Program, that Court opened a case into government corruption and convened a three-judge panel to hear it. In a January 2010 report, the Asian Development Bank reported that there were "many inconsistencies" in the Rental Power Projects contracts. *See Ex Parte* Appl. for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782 (Appl.) [Dkt. 1], Ex. B, Asian Development Bank, Islamic Republic of Pakistan: Rental Power Review (2010) [Dkt. 1-2] ¶¶ 7, 11. On March 30, 2012, the Supreme Court of Pakistan issued a judgment that held that all contracts under the Rental Power Projects Program violated Pakistani Procurement Rules because government functionaries and project contractors had been "prima facie involved in corruption"; the Supreme Court of Pakistan declared that all such contracts were void *ab initio*. Appl., Ex. A, *Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/13/1 (Aug. 22, 2017) (ICSID Award) [Dkt. 1-1]. Without making any specific or general finding of corruption beyond "prima facie," and without any general or specific findings as to Karkey, the Supreme Court ordered Pakistan's National Accountability Bureau (occasionally, NAB) to investigate possible corruption by Pakistani officials and all contractors, including Karkey. *Id.* ¶ 126.

As a result, Karkey's bank accounts in Pakistan were frozen, as were its vessels, until the NAB inquiry was complete. *See* Appl., Ex. E, Letter from NAB to the Maritime Security Agency (April 2, 2012) [Dkt. 1-5]. Thereafter, the National Accountability Bureau conducted "a detailed examination of all accounts and documents" related to Karkey's power supply contract and agreed, by "Deed" dated September 7, 2012, to settle Karkey's account for $17 million USD and expressly to clear Karkey of all liability under the Pakistani National Accountability Ordinance. ICSID Award ¶ 136.

The Deed stated that "KARKEY has no liability, and there remains no basis or evidence for proceeding(s) by NAB or any of the other Parties or GoP [Government of Pakistan] entities against KARKEY and/or its project/investment and that NAB has completed and closed its enquiry in respect of KARKEY." *Id*. The Deed was signed by the Director General of NAB and provided for payment by Karkey of $17.2 million USD to settle all matters arising from the contract, the Supreme Court's judgment, and the NAB inquiry. *Id*. ¶ 136. In addition, in October 2012, the National Accountability Bureau issued a "No Objection Certificate" confirming that it was satisfied that Karkey had no liability under Pakistan's anti-corruption law, and that the National Accountability Bureau had "completed and closed its inquiry [in respect of Karkey]" so that Karkey could retrieve its ships and equipment. *Id*. ¶ 138. The Supreme Court of Pakistan then unilaterally abrogated the Deed and No Objection Certificate and ordered the National Accountability Bureau to recover $120 million USD from Karkey before Karkey's vessels could be released. *Id*. ¶¶ 140-42. Again, however, the Supreme Court of Pakistan made no findings and stated no conclusion as to whether Karkey had engaged in corruption.

In January 2013, the Supreme Court of Pakistan directed the National Accountability Bureau to pursue criminal charges against individuals involved in the Rental

3

Power Projects and even to arrest them. *Id*. ¶ 145. In response, the Chairman of the National Accountability Bureau wrote to the President of Pakistan expressing concern with these directives: by "becoming involved in guiding investigations," the Supreme Court was encroaching on NAB's independence and "placing extreme pressure on NAB personnel who appear before" the Supreme Court. *Id*. ¶ 147. The NAB Chairman also warned that pressure from the Supreme Court created a "danger of unfair investigation being resorted to." *Id*. The Supreme Court responded by issuing a contempt order accusing the NAB Chairman of "causing interference with and obstruction in the process of the Court and . . . the administration of justice." *Id*. ¶ 148. As a result, since 2013 the National Accountability Bureau has pursued and continues to pursue charges against those involved in the Rental Power Projects. Karkey states that one of its vessels was detained for more than two years and its other three vessels remain in Pakistan's possession.

### A. Arbitration Proceedings

Also in January 2013, Karkey initiated arbitral proceedings against Pakistan before an International Centre for Settlement of Investment Disputes (ICSID) Tribunal, pursuant to the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States. *See id.* ¶ 5; *see also* ICSID Convention, Mar. 18, 1965, 17 U.S.T. 1270.[1] Pakistan consented to the submission of investment disputes by Turkish investors to ICSID through a Bilateral Investment Treaty (BIT). *See* ICSID Award ¶ 1.

A tribunal of three international arbitrators was selected to conduct the arbitration and pre-arbitration proceedings. In the arbitration, Karkey claimed that Pakistan violated the

---

[1] "The ICSID Convention is a multilateral treaty formulated by the Executive Directors of the World Bank to further the Bank's objective of promoting international investment." About ICSID, ICSID, https://icsid.worldbank.org/en/Pages/about/default.aspx (last visited Apr. 4 2019).

Contract when the Supreme Court of Pakistan made the "arbitrary" decision that the Contract was void *ab initio*. Opp'n at 9. Pakistan argued that Karkey was not entitled to relief because it had fraudulently or corruptly procured the Contract and, thus, the Arbitral Tribunal lacked jurisdiction to hear Karkey's case under the Bilateral Investment Treaty.

In preparation for the actual arbitration hearing, the parties engaged in discovery for years under procedures established by the Arbitral Tribunal, for which the International Bar Association (IBA) Rules on the Taking of Evidence in International Arbitration (2010) provided guidance. Under the IBA Rules, a party seeking discovery must identify "a narrow and specific requested category of Documents that are reasonably believed to exist" and satisfy the arbitrators that that the requested documents are "relevant to the case and material to its outcome." IBA Rules Arts. 3.3(a), 3.7. The IBA Rules permit a party to object to the production of evidence if it would entail an "unreasonable burden to produce the requested evidence," or based on "considerations of procedural economy, proportionality, fairness or equality of the Parties that the Arbitral Tribune determines to be compelling." *Id*. Arts. 9.2(c), 9.2(g).

The ICSID Convention also contains ICSID Arbitration Rules. *See* ICSID Convention, Arts. 6(1)(c), 44; ICSID Arbitration Rules. Rule 34(2) of the ICSID Arbitration Rules provides that "[t]he Tribunal may, if it deems it necessary at any stage of the proceeding: (a) call upon the parties to produce documents, witnesses and experts . . . ." Article 43 of the Convention also provides that "the Tribunal may, if it deems it necessary at any stage of the proceedings, (a) call upon the parties to produce documents or evidence . . . ." ICSID Convention Art. 43.

During the course of pre-hearing discovery, both sides produced documents to the other. Early in that process, Karkey informed Pakistan that some (but not all) of Karkey's

5

electronic files from prior to April 2010 had been archived to 70 backup tapes (the Backup Tapes) and that those documents would not be accessible without undue burden and expense and may not be recoverable at all due to outdated technology.

Pakistan complained volubly about not receiving relevant documents from the Backup Tapes and submitted three separate requests to the Arbitrators, seeking orders to Karkey to restore and search the tapes. Since the Backup Tapes are at the heart of the instant request for assistance, the Court details those requests to the Arbitral Tribunal.

### 1. *Pakistan's First Request*[2]

Pakistan filed its first application for a Tribunal order in April 2015, explicitly recognizing the Tribunal's discretion to "exclude from production any document which it would be unreasonably burdensome to produce" and that "recovering documents from backup tapes is not a straightforward task." Resp't's Opp'n to Appl. For an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782 (Opp'n) [Dkt. 13], Ex. A, Karkey's Counter-Memorial on Annulment (Counter-Mem.) [Dkt. 13-1] ¶ 58. Karkey replied that "[b]ecause of the number of Backup Tapes and their format, restoring the data on them in a manner that would allow Karkey to search for responsive documents would be extremely costly and time-consuming, and might not even be possible." *Id*. ¶ 59. Instead, Karkey certified to the Tribunal that it had collected, searched, reviewed, and produced all accessible and responsive pre-April 2010 documents, including email. *Id*. ¶ 61. The Tribunal made no decision on the Backup Tapes before the next request from Pakistan.

---

[2] Arnold & Porter describes the First Request as two separate requests; the Tribunal treated them as a single request. For consistency, the Court adopts the Tribunal's framing.

On July 24, 2015, Pakistan again asked the Tribunal to order Karkey to restore the Backup Tapes. *Id*. ¶ 62. Karkey objected, repeating that it had already collected, reviewed and produced responsive electronic and hard copy files from prior to April 2010, to the extent that they had been maintained by individual custodians or found in databases or in files. *Id*. Karkey also noted that Pakistan had failed to identify a narrow and specific category of requested documents, as required by the IBA Rules. *Id*.

The Tribunal denied Pakistan's request on August 31, 2015. It concluded that, in light of Karkey's previous production and the absence of any evidence of spoliation, "restoring 70 pre-April 2010 backup tapes is excessively burdensome." *Id*. ¶ 63; ICSID Award ¶ 529. It also required Karkey to submit a declaration confirming that the search for pre-April 2010 documents had been exhaustive, which Karkey then submitted. *See* Counter-Mem. ¶ 64.

2. *Pakistan's Second Request Based on New Evidence*

Five months later, on December 11, 2015, Pakistan submitted its second request for an order requiring Karkey to restore the Backup Tapes. *Id*. ¶ 65. Pakistan based its second request on information it had received from "a Lebanese individual" who had shown Pakistan's counsel redacted copies of two alleged "Consultancy Agreements" that suggested the existence of a "scheme" to secure Karkey's rental service contract through illicit payments. *Id*. The Lebanese individual refused to give copies of the Consultancy Agreements to Pakistan's counsel and demanded millions of dollars in exchange before turning over the redacted copies. *Id*. ¶ 67; *see also* ICSID Award ¶ 528. Karkey denied the existence of the alleged "scheme" and argued that the third application was "based wholly on hearsay, innuendo, and speculation." Counter-Mem. ¶ 66.

After considering the arguments from both parties, the Tribunal once again denied Pakistan's request. ICSID Award ¶ 530.

### 3. Pakistan's Third Request

The arbitral hearing began in London on February 29, 2016. On March 1, the second day, Pakistan again proffered evidence of corruption and asked the Tribunal to order Karkey to restore and search the Backup Tapes. *Id.* ¶ 531. The Tribunal "dealt with the application on Day 2 of the Evidentiary Hearing" and decided to admit some, but not all, of the evidence proffered by Pakistan; the Tribunal declined to order production of the Backup Tapes. *Id*. ¶ 532-33. According to the Tribunal:

> The basis for the Application was stated to be "new evidence of which Pakistan has only very recently been made aware through the unsolicited approach by a Lebanese individual"—in itself, a curious story. The documents allegedly available were themselves very suspicious. The alleged Consultancy Agreements . . . were mere copies and had names and dates redacted, making it impossible to verify their authenticity. It can also be noted from . . . the Attendance Notes that Pakistan's counsel themselves had serious doubts about the authenticity of the alleged new evidence relating to the purported Scheme. Moreover, Pakistan's explanation that it had continued its dialogue with [the informant] but that the latter withdrew his cooperation when he found out about Pakistan's application to the Tribunal, together with the fact that Pakistan's alleged informants were requesting a huge amount of money to cooperate, are such to destroy any semblance of credibility of the new "evidence".

*Id.* ¶ 536. Contrasting the evidence supporting Pakistan's request for the Backup Tapes with the powers and investigation of the National Accountability Bureau, the Tribunal emphasized that "NAB itself concluded that there was no evidence of any wrongdoing by Karkey under Pakistan's anti-corruption law" and that "the Supreme Court has made no specific finding of corruption in its Judgment regarding Karkey." *Id*. ¶¶ 538-39. The Tribunal concluded that there was no evidence of corruption in the record and that the evidence described by Pakistan was "more probably aimed at extorting money from Pakistan or at derailing the arbitration proceedings than at genuinely allowing corruption to be established." *Id.* ¶ 543.

8

### 4. Arbitral Outcome

The Tribunal found and awarded judgment in Karkey's favor in August 2017. *See id.* ¶ 1081. Pakistan subsequently filed a request to annul the Award. *See* Appl., Ex. I, Request for Annulment of Award [Dkt. 1-9].

### B. The § 1782 Application

Pakistan submitted its *Ex Parte* Application for an Order Permitting Discovery on Arnold & Porter on August 8, 2018.[3] *See* Appl. Pakistan's document subpoena (Subpoena) seeks documents from January 1, 2008, to April 30, 2010:

> 1. All documents related to the negotiation of agreement of any sort between Karkey and any entity owned or controlled by Pakistan;
> 2. All documents showing any payments of money or any item of value by Karkey to any of its employees or agents in Pakistan;
> 3. All documents showing any payments of money or any item of value by Karkey to any person or entity with the purpose of such payment reaching Karkey's employees or agents in Pakistan;
> 4. All documents showing any payment of money or any item of value by Karkey to Raja Babar Ali Zulqarnain;
> 5. All documents showing any payment of money or any item of value by Karkey to any entity owned (directly, indirectly, or beneficially) by Raja Babar Ali Zulqarnain;
> 6. All documents showing any payment or money or any item of value by Karkey to any entity owned (directly, indirectly, or beneficially) by Bushra Ali Zulqarnain;
> 7. All documents showing the guidelines or procedures for keeping or maintaining the Backup Tapes;
> 8. All documents related to any response to the Request for Interrogatories . . . .

Appl., Ex. L, Subpoena to Produce Documents, Information, or Objects [Dkt. 1-12]. Pakistan's Interrogatories can be more readily summarized. They ask for the identities and contact information for all custodians of the Backup Tapes; the identities and contact information for all

---

[3] Pakistan is represented by U.S. counsel. Their clever references to Arnold & Porter as "the Target" are unprofessional and undermine their legal argument.

9

individuals or entities with access to the Backup Tapes from January 1, 2008 to the present; an explanation of how the Backup Tapes are preserved and maintained "including details on any encryption, method for tracking or confirming access to or review of the Backup Tapes, and the methods for collecting, storing, and ensuring the integrity of the information contained in the Backup Tapes"; and the terms under which access was terminated for any who did have access to the Backup Tapes. Further, Pakistan wants to know Arnold & Porter's retention policies for client documents; whether Arnold & Porter represents any of the persons identified and the scope of that representation; and an explanation of the relationship between Arnold & Porter and certain identified persons. *See generally* Appl., Ex. M, Interrogs. Pursuant to *Ex Parte* Appl. for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782 (Interrogs.) [Dkt. 1-13].

On September 25, 2018, the Court denied the *ex parte* Application and required Pakistan to serve it on Arnold & Porter. *See* 9/25/18 Order [Dkt. 4]. Pakistan served the Application and the Court's Order on Arnold & Porter on October 9, 2018. Arnold & Porter objects to the Application. *See* Opp'n; Reply in Supp. of Pakistan's *Ex Parte* Appl. for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782 (Reply) [Dkt. 14].[4] Arnold & Porter

---

[4] Pakistan filed a Motion for Leave to Amend Pleadings (Am. Mot.), Dkt. 15, and an Amended Application after Arnold & Porter filed its response. *See* Am. *Ex Parte* Appl. for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782 (Am. Appl.) [Dkt 15-1]. The Amended Application indicates that Pakistan requested a revision of the Award based on new alleged evidence of corruption by Karkey and that the ICSID has provisionally stayed enforcement of the Award and reconstituted the Tribunal. *See* Am. Appl., Ex. R, Letter Regarding Reconstitution of Tribunal [Dkt. 15-21]. Pakistan suggests that the revision proceedings constitute a separate "foreign proceeding" for which the discovery it seeks is to be used. Am. Mot. ¶ 3. Otherwise, "Pakistan has refrained from making any other substantive changes to the 1782 Application" and the "discovery sought in the original 1782 Application (the 'Backup Tapes') is the same discovery sought in the amended 1782 Application." *Id.* Arnold & Porter opposes the motion. *Id.* ¶ 4. The Court will deny the motion to file an Amended Application as unnecessary and duplicative. As discussed below, the Court concludes that the ICSID Tribunal constitutes a "foreign proceeding" but declines to exercise its discretion to order discovery which that very Tribunal refused.

10

submitted a declaration from one of its attorneys stating that it "does not now have, and at no time before, during, or after the Arbitration has Arnold & Porter ever had, possession or custody of the backup tapes." Opp'n, Ex. 2, Decl. of Andrew Ware (Ware Decl.) [Dkt. 13-2] ¶ 4.

## II. LEGAL STANDARD

Section 1782 authorizes the district court, in its discretion, to "order [a person within its reach] to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation." 28 U.S.C. § 1782(a).

In addressing a discovery application, the Court considers first whether it has the authority to grant the request and then whether it should exercise its discretion to do so. *Norex v. Petroleum Ltd. v. Chubb Ins. Co. of Canada*, 384 F. Supp. 2d 45, 49 (D.D.C. 2005) (citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004)). When determining its authority to grant a discovery request under 1782, the Court considers "(1) whether the person from whom discovery is sought resides or is found in the district where the action has been filed; (2) whether the discovery sought is for use in a proceeding before a foreign or international tribunal; and (3) whether the application is made by a foreign or international tribunal or 'any interested person.'" *Id.* (citing *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d. Cir. 2004)).

If the Court determines it has authority to grant the request, it must then determine whether it should exercise that authority. *See Intel*, 542 U.S. at 264 ("[A] district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so."). The Supreme Court has discussed "factors that bear consideration in ruling on a §1782(a) request." *Id.* at 264. Those include: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal and the character of

11

the proceedings; (3) whether the application conceals an attempt to circumvent foreign proof-gathering restrictions or other policies; and (4) whether the discovery sought is unduly intrusive or burdensome. *Id.* at 264-65. Review of these factors is framed by the "twin aims" of § 1782: "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Id.* at 252.

### III. ANALYSIS

It is not disputed that Arnold & Porter resides in the District of Columbia. Nor is it disputed that Pakistan is an "interested person" for the purposes of § 1782. However, Arnold & Porter argues that neither the ICSID Tribunal nor the National Accountability Bureau's Investigation is a "foreign or international tribunal" within the meaning of § 1782, and that the Court should exercise its discretion to deny Pakistan's Application. The Court considers the application of its authority to each of the proceedings separately.

### A. ICSID Tribunal

#### *1. Court's Authority*

Arnold & Porter argues that a "supra-national arbitral institution" such as the ICSID is not the type of foreign or international tribunal contemplated by Congress when it enacted § 1782. Specifically, Arnold & Porter cites decisions in the Second and Fifth Circuits rejecting the use of § 1782 in support of private commercial arbitrations. *See Nat'l Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184 (2d. Cir. 1999) ("[T]here is no indication that Congress intended [§ 1782] to reach private international tribunals."); *Republic of Kazakhstan v. Biedermann Intern.*, 168 F.3d 880 (5th Cir. 1999). In each of those cases, private parties arbitrating their disputes in the International Court of Arbitration of the International Chamber of Commerce (ICC) were denied discovery. Arnold & Porter acknowledges, however, that district courts have split on the issue since the Supreme Court appeared to open the door to such

12

discovery in its 2004 opinion in *Intel*. *See In re Grupo Unidos Por El Canal, S.A.*, No. 14-mc-00226, 2015 WL 1810135, at *6 (D. Col. Apr. 17, 2015) (collecting cases).

The debate is interesting but inapplicable. District courts, including in this district, have regularly found that arbitrations conducted pursuant to Bilateral Investment Treaties, and specifically by the ICSID, qualify as international tribunals under the statute. *See In re Veiga*, 746 F. Supp. 2d 8, 22-23 (D.D.C 2010) (collecting cases). Arnold & Porter has identified no split regarding ICSID cases. Unlike arbitrations before the ICC, arbitrations pursuant to Bilateral Investment Treaties are not merely private arrangements; they are sanctioned by their governments; governments participate in them, such as here. Indeed, this is a distinction that both the Second and Fifth Circuits understood even before *Intel*. *See Nat'l Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184, 190 (2d. Cir. 1999) ("It is clear that the 1964 legislation was intended to broaden . . . the reach of the surviving statute to intergovernmental tribunals not involving the United States."); *Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880, 882 (5th Cir. 1999) ("References in the United States Code to 'arbitral tribunals' almost uniformly concern an adjunct of a foreign government or international agency."). This Court agrees that "BIT Arbitration falls within the metes and bounds of § 1782(a)." *In re Viega*, 746 F. Supp. 2d at 22-23.

2. *Discretionary Factors*

a. Jurisdictional Reach of the Foreign Tribunal

"[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. This is because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's

jurisdictional reach; hence their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*

Pakistan points out that Arnold & Porter is not a participant in the Arbitration and thus argues that its request for assistance should be granted. But this factor is not as helpful as Pakistan contends. Although Arnold & Porter is not a party to the arbitration, its client, Karkey, is. "A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id*. Ah, yes, Pakistan tried to do that and was denied, three times. This factor does not weigh in favor of granting the Application.

      b.   Nature and Receptivity of the Foreign Tribunal

Arnold & Porter states that even if § 1782 applies to ICSID arbitrations, it should not apply in the context of Annulment proceedings for which "[i]n principle, no new evidence shall be admitted in this proceeding." Appl., Ex. N, Annulment Procedural Order No. 1 [Dkt. 1-14] ¶ 16.4. But the "party resisting discovery must point to 'authoritative proof' that the foreign tribunal would reject the evidence sought." *In re Veiga*, 746 F. Supp. 2d at 23-24 (quoting *In re Appl. of Caratube Int'l Oil Co.*, 730 F. Supp. 2d 101, 105-06 (D.D.C. 2010)). The same rule cited by Arnold & Porter further states that "[s]hould either Party wish to introduce new documents or other evidence, . . . that Party shall file a request to the Committee." Appl., Ex. N, Annulment Procedural Order No. 1 ¶ 16.4. Thus, ICSID has left open a window for Pakistan to submit new evidence. This factor weighs in favor of granting the Application.[5]

---

[5] Pakistan also states in its Amended Application that the original Tribunal has since been reconvened to consider Pakistan's request for revision of the Award. Am. *Ex Parte* Appl. for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782, Ex. R, Letter Regarding Reconstitution of Tribunal [Dkt. 15-21]. This information was provided to the Court after Arnold & Porter filed its response and does not alter the Court's analysis but is not denied.

### c. Circumvention of Foreign Proof-Gathering Restrictions and Policies

Three times now Pakistan has asked the Tribunal to authorize it to demand the Backup Tapes from Karkey and three times now Pakistan's request has been denied. The Tribunal has repeatedly and thoroughly considered Pakistan's request and concluded that additional discovery was unwarranted. Pakistan argues that once it has the Backup Tapes the only question before the Tribunal will be their admissibility, but that argument misses the point. As discussed above, the Tribunal has authority to order discovery of the tapes and has repeatedly refused to do so. Asking this Court for that same discovery from Karkey's U.S. counsel, Arnold & Porter, is clearly an end-run around the Tribunal's evidentiary procedures, which apply to both Karkey and Pakistan. Pakistan attempts to construe the instant request as unrelated to arbitral discovery and "unique to the idiosyncratic procedural posture of the case," Reply at 11, but its description (a) still gives this Court no reason to disregard the Tribunal's rulings, and (b) ignores substantive findings by the Tribunal that "restoring 70 pre-April 2010 back-up tapes is excessively burdensome in this case." Counter-Mem. ¶ 63; *see also In re Appl. of Caratube Int'l Oil Co.*, 730 F. Supp. 2d at 106 ("Parties to an arbitration are free to set the procedural rules for arbitrators to follow." (internal quotes omitted)). This factor militates strongly against granting the Application.

### d. Scope of Discovery

Arnold & Porter avers that it does not have, and never has had, possession, custody, or control of the Backup Tapes. Ware Decl. ¶ 4. "The burden of establishing control over the documents sought is on the party seeking production." *Norex*, 384 F. Supp. 2d at 56 (quoting 7 Moore's Federal Practice § 34.14(2)(b) (2004)); *see* Fed. R. Civ. P. 34(a)(l) (requiring requested items to be "in responding party's possession, custody, or control"). "Control is the test with regard to the production of documents and is defined not only as possession, but as the

15

legal right to obtain the documents on demand." *Norex*, 384 F. Supp. 2d at 56 (marks omitted) (quoting *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984)). Pakistan has produced no evidence to rebut Mr. Ware's declaration. Pakistan characterizes this as a mere technicality, but Arnold & Porter cannot produce what it does not have. This too militates against granting the Application.

### B. National Accountability Bureau Investigation

#### 1. *Court's Authority*

Arnold & Porter agrees in the abstract that an investigation by the National Accountability Bureau would constitute a foreign tribunal but argues vehemently that this particular investigation is being "conducted in bad faith" and has "no legitimate basis." Opp'n at 24. This distinction falls more in line with a discussion of the nature of the foreign tribunal and use of the Court's discretion and is addressed there.

#### 2. *Discretionary Factors*

##### a. Jurisdictional Reach of the Foreign Tribunal

As with the ICSID arbitration, Pakistan argues that Arnold & Porter is not under investigation by the National Accountability Bureau and, therefore, it is a third party from whom Pakistan can properly obtain discovery under § 1782. But, again, Karkey *is* directly involved and under investigation. Neither Party provides much detail of the scope of jurisdiction NAB might have over Karkey, but it is undisputed that NAB and the judicial system of Pakistan have *some* jurisdiction over Karkey's assets since NAB issued a Deed and No Objection Certificate to Karkey after examining its books and records and Pakistan still retains three of Karkey's ships. These facts counsel against granting the Application.

### b. Nature and Receptivity of the Foreign Tribunal

Arnold & Porter describes the NAB investigation as "a politically motivated harassment campaign against Karkey stemming from an arbitrary and illegitimate decision by Pakistan's Supreme Court" and states that "Pakistan's Application appears to be intended more to frustrate Karkey's attempts to enforce the Award than to uncover evidence of corruption for purposes of the endless NAB investigation." Opp'n at 30-31. Arnold & Porter thus asks the Court not to indulge such abuse of investigatory authority.

Professor Hans Smit, "a leading commentator and drafter of § 1782," *In re Sargeant*, 278 F. Supp. 3d 814, 819 (S.D.N.Y. 2017), has written that "[a] refusal to grant assistance under Section 1782 may also be based on the district court's finding that, in some way, the foreign proceedings are unfair or incompatible with domestic notions of propriety." Hans Smit, American Assistance to Litig. in Foreign and Int'l Tribunals, 25 Syracuse J. Int'l L. & Com. 1, 15 (1998); *see also United States v. Sealed 1, Letter of Request for Legal Assistance from the Deputy Prosecutor General of the Russian Federation*, 235 F.3d 1200, 1205-06 (9th Cir. 2000) ("[T]he statute provides considerable discretion to district courts to decline to order U.S. authorities to assist in situations where the foreign government has, for example, insufficient basis to believe that evidence may be found here, or is simply seeking to harass political opponents."). Certainly it does not inure to Pakistan's benefit that its Supreme Court made no findings of corruption generally as to the Rental Power Projects or specifically as to Karkey; that the National Accountability Bureau settled the matter with Karkey by Deed and then issued a No Objection Certificate stating that it had "completed and closed its inquiry [in respect of Karkey]," ICSID Award ¶ 136; and that the former NAB Chairman stated that the Supreme Court's actions created a "danger of unfair investigation being resorted to," *Id.* ¶ 147. None of these facts is addressed in Pakistan's brief.

However, Professor Smit has also cautioned that "American courts should not condemn foreign proceedings merely because they are different from those conducted in, or unknown to, American courts." Smit at 15. "It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity . . . ." *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991) (quoting *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir. 1976)). Caution seems particularly warranted when the dispute is an internal one, between different institutions within a foreign government. It is clear that Pakistan's Supreme Court authorized the NAB investigation; that NAB "authorized" the instant Application, Appl. at 9; and that counsel for Pakistan filed said Application with this Court. Moreover, the Application does not ask the Court to facilitate the extradition of a political opponent or the seizure of assets; it asks merely for civil discovery, as to which Pakistan has offered to pay in part. *See id.* at 14. Although muted by the facts surrounding this case, this factor weighs somewhat in Pakistan's favor.

c. Circumvention of Foreign Proof-Gathering Restrictions and Policies

Neither Party has provided details as to the National Accountability Bureau's proof-gathering abilities, policies, and restrictions. Without evidence of circumvention, this factor weighs in favor of granting the Application.

d. Scope of Discovery

As discussed above, Pakistan cannot overcome the fact that Arnold & Porter neither possesses nor controls the Backup Tapes. Although Pakistan states that it "cannot limit itself to the Backup Tapes," Appl. at 4 n.3, there is no doubt that Arnold & Porter has already certified to the ICSID that Karkey has produced all responsive documents that could be located and this Court will not require a duplication of that effort. There being no basis to enforce

Pakistan's Subpoena to Produce Documents, Information, or Objects, Dkt. 1-12, it will be denied.

A different analysis applies to Pakistan's Interrogatories. They ask a number of basic questions to the effect of "who has the tapes?" and "when did they have access to the tapes?" and "how are the tapes stored?" *See generally* Interrogs. Even without possession or control of the Backup Tapes, Arnold & Porter may nonetheless be able to answer these Interrogatories, which do not require burdensome document recovery, review, and production. The extent to which any such information may be protected by a privilege cannot be addressed on this record but may be raised in due course. Therefore, the Court will order Arnold & Porter to answer the Interrogatories at Dkt. 1-13 propounded by Pakistan.

### IV. CONCLUSION

The *Intel* factors weigh against granting the Application as part of the ICSID Arbitration. However, while it is not a one-sided issue, the *Intel* factors favor granting the Application in part—limited to the Interrogatories at Dkt 1-13—due to the National Accountability Bureau's investigation. Pakistan's Application for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782, Dkt. 1, will therefore be granted in part and denied in part. A memorializing Order accompanies this Memorandum Opinion.

Date: April 10, 2019

ROSEMARY M. COLLYER
United States District Judge